## DECKER *v.* KLINGMAN.

1. BROKERS — REAL ESTATE — CONTRACT TO SELL — MERGER IN WRITING.

   In an action by a real estate broker to recover commissions on the sale of land, evidence examined, and *held*, that all prior negotiations regarding the contract of employment were merged in the written agreement between the parties containing an option.

2. SAME—COMMISSIONS—WHEN ENTITLED.

   Where a real estate broker is employed to sell real estate within a certain time, and the time expires without his having made the sale, he is not entitled to his commission, though the sale is ultimately made by the landowner to a person introduced by the broker, there being no fraud or bad faith on the landowner's part to prevent performance on the part of the broker.[1]

[1] As to performance by a real estate broker of his contract to find a purchaser, see note to *Lunney* v. *Healey* (Neb.), 44 L. R. A. 593.

Error to Kent; Wolcott, J. Submitted June 6, 1907. (Docket No. 44.) Decided July 1, 1907.

Assumpsit by Peter W. Decker and Fred R. Jean, co-partners as Decker & Jean, against Philip J. Klingman for commissions on the sale of real estate. There was judgment for defendant on a verdict directed by the court, and plaintiffs bring error. Affirmed.

*Smedley & Corwin,* for appellants.

*Taggart, Denison & Wilson,* for appellee.

BLAIR, J. Plaintiffs brought suit to recover commissions alleged to be due them for services as brokers in procuring a purchaser for certain real estate of defendant. Negotiations began in the spring of 1905.

" This Klingman property was not listed under contract. We had a description of the property, knew it was for sale, and had instructions from Klingman to sell it before the written option was taken."

February 26, 1906, plaintiffs received a letter from defendant, in part, as follows:

" Mrs. Klingman advised me yesterday that you had called at the house Saturday in regard to possibility of our disposing of our house, and, while I am very reluctant to bring this subject up with her, because it seems to be an unpleasant one, she gave it more consideration this time than at any time in the past. Now, if you are talking business, or can talk business, why, I think we could be willing to listen; but there is no use of talking about exchange of property or anything of that kind, and if your party are thinking seriously of purchasing that property, why, let them make an offer. During our various talks you know what figure I would expect for the place.

" Our position is this: Mrs. Klingman doesn't want to sell, and I do. At the same time, I have very little to say in this matter. However, we intend doing one of two things, namely, if I don't sell, in all probability I shall build a double house on the lot adjoining my present resi-

dence, as I have 120 feet of ground, and it is more than I want.

"If anything is to come of this, better get down to business at once because if you don't do business now that will end it."

Plaintiff Jean testified:

"I went to Mrs. Klingman before that option was signed, and went to Mr. Klingman, but he told me that Mrs. Klingman didn't want to sell, and there was no use talking unless I could get her to agree to sell. I had an oral agreement with Mr. Klingman then, March 5th. He told me that any time I could get Mrs. Klingman's consent I could show the property and sell it. A week or so before that agreement was signed, I went to see Mrs. Klingman myself at Mr. Klingman's suggestion, and followed it up by getting this signed on March 5th. Until that time I didn't have any definite thing to go upon, because Mrs. Klingman had never consented. I couldn't make that sale without her consent."

On March 5th, the parties entered into the following contract:

"GRAND RAPIDS, MICH., March 5, 1906.

"In consideration of the sum of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, and to be considered as part of the purchase money, I hereby agree to sell the property located at 152 South College avenue, lot 120x132 ft. in the city of Grand Rapids, county of Kent and State of Michigan, to Decker & Jean or their assigns for the sum of sixteen thousand dollars. The terms of sale to be as follows: $16,000.00 on delivery of warranty deed, and we are to have possession of said house until October 1, 1906, and we are to pay Decker & Jean 2½ per cent. when sale is completed.

"Sale to be closed on or before April 1, 1906.

"I to furnish an abstract of the property, written up to date; also abstract of taxes, and to give a clear title.

[Signed]          "Mrs. JOSEPHINE KLINGMAN.
                   "P. KLINGMAN.

"I hereby agree to purchase the above described property from ———, at the price and on the terms above mentioned, on or before ———, 190—, or forfeit the above payment of $———.

          "[Signed] ———."

On the back of said paper is the following:

"I, P. Klingman, have signed the option with the understanding that, if Mrs. P. J. Klingman will not sign, that signature is null and void.

                                    "P. J. KLINGMAN.
                            "DECKER & JEAN, per Jean."

Plaintiffs were endeavoring to sell the property to Mr. Tuthill, whose partner in business, Mr. Baldwin, the owner of the adjoining property, was very anxious that he should purchase, and, to that end, was willing and desired to purchase a portion of the land adjacent to his premises. Plaintiffs were notified prior to the 1st of April that they must make the sale on or before April 1st, as provided in the written agreement. After the making of the written agreement, defendant agreed orally to accept $14,000 net for the property. On March 27th, plaintiffs received the following letter from defendant:

"Beg to acknowledge receipt of your favor of the 27th. As regards making sale of property, would state, I would be greatly pleased if you make the sale exactly on lines your option calls for and within the space of time called for in option, and, to use your own words, I hereby notify you that if you don't sell the property before the expiration of the option that we will consider the option as null and void, in accordance with date on same, and if I then desire to sell the property, shall either make a new deal with you or dispose of it myself. As for paying you any commission after date of option expires, would state that might be a question of law, which you might have to go through to collect anything I might think isn't due you. I believe that after April 1st you aren't entitled to anything, no matter who I sell the property to, and I will state very clearly the following facts, namely, that we shall not sell the property to your customer. I did think that I might concede something to you, whether we sold your customer or not, but if you take such a decided stand as you have in your letter, I question whether you are entitled to anything, as you apparently may go on the 'whole hog or none' plan.

"I would suggest that you advise me of any develop-

ments as regards progress Mr. Decker is making, as you have but a few days left to exercise your option.

"Yours truly,<br>
"P. J. KLINGMAN."

Plaintiff Jean testified:

"After I got this letter of the 27th, I approached both Baldwin and Tuthill again in regard to buying the property and got the same response, except that Mr. Tuthill said that the deal was all off; he wouldn't have anything to do with it; and so did Mr. Baldwin, except that he wanted me to see Mr. Klingman and see if he could buy 25 feet or more off from the lot, and let Klingman keep the balance, to see if Klingman would make him a price on that 25 or 50 or 60 feet. He didn't care how much. I saw Mr. Klingman in regard to it. He said he wouldn't sell Mr. Baldwin any of it. If he didn't sell it all, he wouldn't sell any of it."

Plaintiffs were unable to sell the property for $14,000 net during the period prescribed, and defendant, a few days after the expiration thereof, sold the property to Mr. Baldwin for $15,500. Prior to the purchase by Mr. Baldwin, it was agreed between him and Mr. Tuthill that Mr. Tuthill should take the house and 99½ feet of land, pay $8,500, and assume a mortgage of $4,500, and Mr. Baldwin should take the remaining 20 feet of land and pay $2,500. Mr. Tuthill, who was called as a witness by plaintiffs, testified:

"When I talked with Mr. Jean shortly before the 1st of April, he said that Mr. Klingman wouldn't sell for $14,000, and I told him I wouldn't pay any more. I then definitely and finally abandoned all negotiations for that property. After that I looked through several houses and had practically decided to buy the Welch property. We had agreed on all the terms incident to the deal, and I should have undoubtedly closed it up if the matter had not finally come up in another form through Mr. Baldwin. Mr. Baldwin went with me to look through the Welch house, and I think on the same day after going through that house we went through the Klingman house. * * * I am not able to give you the date when I went to Klingman's house with Mr. Baldwin. I should

imagine it was after the 1st of April, somewhere about the 3d or 4th, I couldn't state positively. I made no memorandum of the date at all."

At the close of plaintiffs' testimony, the court, on motion of defendant's counsel, directed a verdict for defendant. To review the judgment entered upon the verdict, plaintiffs prosecute this writ of error.

We think that the court correctly held that all prior negotiations were merged in the written agreement; that the rights of the parties must be determined thereby, except, perhaps, as to the modification of the price to be paid for the property; that plaintiffs failed to perform the contract; that the evidence negatived any inference of fraud or bad faith on the part of defendant to prevent performance by plaintiffs; and that after April 1, 1906, defendant was at liberty to sell the property to whomsoever he chose, without liability to plaintiffs.

The judgment is affirmed.

CARPENTER, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.